314 N.E.2d 92 (1974)
James Earl PATTERSON, Defendant-Appellant,
v.
STATE of Indiana, Plaintiff-Appellee.
No. 3-873A107.
Court of Appeals of Indiana, Third District.
July 24, 1974.
Rehearing Denied October 7, 1974.
*93 Thomas H. Clifford, Merrillville, for defendant-appellant.
Theodore L. Sendak, Atty. Gen., David A. Miller, Deputy Atty. Gen., Indianapolis, for plaintiff-appellee.
HOFFMAN, Chief Judge.
Defendant-appellant James Earl Patterson was charged by indictment with murder in the first degree. IC 1971, XX-XX-X-X, Ind. Ann. Stat. § 10-3401 (Burns Supp. 1973). To such charge appellant pleaded not guilty. Following trial before a jury appellant was found guilty of the lesser included offense of involuntary manslaughter and sentenced to imprisonment for a period of not less than one nor more than ten years. Thereafter, appellant's motion to correct errors was overruled and this appeal was perfected.
An examination of the evidence most favorable to the State discloses that during the night immediately prior to the early morning hours of August 2, 1972, appellant's wife, Patricia Patterson, accompanied the deceased, George Hall, to a drive-in movie. Afterward, Hall left Mrs. Patterson at her residence and, at approximately 12:30 A.M. returned to his own apartment where he was joined by a friend, James Earl Jones, and Miss Jonnie Mae Robinson, a tenant who occupied a basement apartment in the same building. After the three had had something to eat, Jones went to Miss Robinson's apartment to take a nap while Miss Robinson remained with Hall.
Upon Mrs. Patterson's return to her residence after having been in the company of George Hall, a continuation of an *94 argument that had begun earlier occurred between Mrs. Patterson and the appellant, her husband. At that time, Patterson learned that his wife had attended a drive-in movie with George Hall, and became angry. Patterson then obtained a knife from the kitchen, took his wife by the arm and proceeded to Hall's apartment. After Patterson and his wife were admitted to Hall's apartment, an argument erupted between Patterson and Hall in which the appellant accused Hall of taking his wife to a drive-in movie earlier in the evening. Patterson repeatedly stated in an angry tone, "I'm going to kill you if you don't tell me something", and, further, "why did you take my wife to the drive-in[?]" George Hall responded with "cool it man, cool it", and "maybe I can explain something." During the argument, Patterson struck his wife chipping one of her teeth. Shortly thereafter, a physical struggle occurred between appellant and the deceased which culminated in the fatal stabbing of Hall.
Miss Robinson, who heard the voices of the combatants and witnessed part of the struggle, left to obtain help. As she exited, she observed both Patterson and Hall in the hallway of the apartment and noted that at the time Hall was kneeling on the floor.
James Jones had been resting in Miss Robinson's basement apartment when he heard the sound of commotion. Jones proceeded upstairs after being summoned by Miss Robinson and found George Hall lying face down on the floor of his apartment near the entrance. Hall appeared to be gasping for air. After an unsuccessful attempt by Jones to turn him over, Hall ceased gasping and no longer exhibited any movement.
Shortly thereafter, Detective Edward Chale of the Gary Police Department arrived at the scene. In order to gain entry to Hall's apartment, he found it necessary to move Hall's body which was blocking the doorway. During his subsequent investigation, Detective Chale determined that Hall was dead and, upon turning the body over, found a butcher knife which he concluded was the weapon used in the crime.
An autopsy revealed that the deceased, George Hall, died as the result of a wound which perforated the heart, the right bronchi and the right pulmonary artery causing a massive hemorrhage in the right chest and pericardial cavity.
It is to be noted initially that the sufficiency of the evidence to support appellant's conviction of the offense of involuntary manslaughter is not questioned. The foregoing factual circumstances, however, have been included in order to supply background to several of appellant's succeeding arguments.
The first issue is whether the trial court erred in overruling appellant's challenge to the venire from which the jury panel was drawn. Appellant, in his motion to correct errors, asserts that black citizens were systematically excluded from the venire and that he was thereby denied his right to a trial by a jury of his peers.
The Supreme Court of the United States has consistently held that jury selection systems are required to draw prospective jurors from a fair cross-section of the community. Thiel v. Southern Pacific Co. (1946), 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181; Glasser v. United States (1942), 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680; Smith v. Texas (1940), 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84; Strauder v. West Virginia (1879), 100 U.S. 303, 25 L.Ed. 664. Reasonable qualifications, however, may be imposed notwithstanding the fact that they may detract from the cross-section present in the actual jury pools. See: United States v. Butera (1st Cir.1970), 420 F.2d 564.
The burden of demonstrating purposeful discrimination is imposed initially upon the defendant. Sanders v. State (1972), Ind., 284 N.E.2d 751. See: Whitus v. Georgia (1967), 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599; Hernandez v. Texas *95 (1954), 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866. Further, in United States v. Butera, supra, at 569 of 420 F.2d, it is stated:
"Thus, while `purposeful discrimination' may connote an element of bad faith in ordinary usage, the term has not been so limited by the Supreme Court; rather, the breadth with which the term has been used by the Court indicates that purposeful discrimination exists whenever significant unexplained disparities exist. In other words, it is not the significant disparities themselves which are unconstitutional, Akins v. Texas, 325 U.S. at 403-404, 65 S.Ct. 1276, 89 L.Ed. 1692; Hoyt v. Florida, 368 U.S. at 69, 82 S.Ct. 159, 7 L.Ed.2d 118; they only raise the inference of discrimination. E.g., Billingsley v. Clayton, 359 F.2d 13, 17 (5th Cir.1966), (en banc), cert. denied, 385 U.S. 841, 87 S.Ct. 92, 17 L.Ed.2d 74 (1966); Witcher v. Peyton, 382 F.2d 707, 709-710 (4th Cir.1968); Salary v. Wilson, 415 F.2d 467, 470-471 (5th Cir.1969). Once that inference has been raised, it is the government's failure or inability to demonstrate that the disparities are not the product of discrimination which confirms the inference and invalidates the jury pool. E.g., Witcher v. Peyton, 405 F.2d 725 (4th Cir.1969)." (Emphasis supplied.)
The central question then, is whether appellant succeeded in establishing a "significant disparity" between black citizens who were selected for jury service and the percentage of black citizens in the community. Sanders v. State, supra.
Counsel for appellant in challenging the jury selection process, noted that an excess of seventy jurors were present in court on the previous day and that approximately four out of the seventy were black citizens. Counsel thereafter stated his belief that the percentage of black citizens in the county amounted to approximately ten to twenty per cent. Appellant's argument that a significant disparity was thereby shown must fail, however, under reasoning similar to that which was succinctly stated in Sanders. Therein, our Supreme Court, at Ind., at 757 of 284 N.E.2d, stated that,
"[A]bsolutely no evidence was introduced which would establish the number of Negro citizens selected for the jury panels. For example, it was established that fifty-seven of the one hundred seventy-five persons selected on the jury panel in the present case failed to appear for duty. Appellant introduced no evidence which would indicate how many of the absentees were Negroes. It would be an absured exercise in speculation for this Court to invalidate a jury selection process when the only evidence on the subject relates solely to the persons appearing for duty rather than to the persons selected on the original panel. Therefore, we need not decide what constitutes a `significant disparity' since the appellant failed to introduce reliable data upon which to base a finding." (Emphasis supplied in part.)
In the case at bar, no evidence was introduced to show that the group of jurors present in court represented the entirety of the jurors selected. Moreover, counsel's statements concerning his beliefs as to the racial composition of the county and his recollections as to the number of black citizens present cannot be regarded as "reliable data" from which a determination could be made.
The next issue is whether the trial court erred in admitting into evidence over appellant's objections State's Exhibits Nos. 2, 3 and 7 which were photographs taken at the scene of the crime.
With regard to State's Exhibit No. 2, which is a view of the upper portion of the body of the deceased showing a wound on the right side of the chest, it is asserted that such exhibit does not tend to prove any issue in controversy; that it is shockingly morbid, ghastly and macabre; that its introduction during the testimony of *96 the doctor who performed the autopsy was calculated to arouse passion and prejudice from the jury; and that the admission of the photograph into evidence constituted an abuse of discretion on the part of the trial court. Appellant further contends that State Exhibits Nos. 3 and 7 which are different views of the deceased lying face down in the hallway of his apartment were not relevant and did not enlighten the jury on any material issue in the case.
We first observe that the admission of a photograph into evidence is a matter within the sound discretion of the trial court. The trial court's action, moreover, will not be disturbed in the absence of a demonstrated abuse of such discretion. Hubble v. State (1973), Ind., 299 N.E.2d 612; New v. State (1970), 254 Ind. 307, 259 N.E.2d 696; Randolph v. State (1954), 234 Ind. 57, 122 N.E.2d 860.
The relevancy of a photograph may be determined by an inquiry as to whether a witness would be permitted to describe verbally the objects photographed. Pierce v. State (1970), 253 Ind. 650, 256 N.E.2d 557; Hawkins v. State (1941), 219 Ind. 116, 37 N.E.2d 79.
The requirements of this test have been fulfilled in the instant case.
State's Exhibit No. 2 was offered into evidence in support of the testimony of the doctor who performed the autopsy upon the deceased. His testimony related to the nature and extent of the wound which was the cause of death. Such testimony was competent and relevant and taken without objection. The photograph which was the only one introduced showing the size and location of the fatal wound must be considered to have been properly admitted.
See: Hubbard and Moon v. State, Ind., 313 N.E.2d 346 (1974); New v. State, supra; Perkins v. State (1950), 217 Ark. 252, 230 S.W.2d 1; Bryan v. State (1949), 206 Ga. 73, 55 S.E.2d 574 (Cert. denied, 339 U.S. 904, 70 S.Ct. 513, 94 L.Ed. 1333).
In Kiefer v. State (1958), 239 Ind. 103, 153 N.E.2d 899, a total of six photographs showing the body of the deceased from different angles were admitted into evidence. With regard to the admissibility of three of the photographs, the court, at 108 of 239 Ind., at 900 of 153 N.E.2d, stated:
"Even though these photographs representing Exhibits Nos. 10, 11 and 12 may have been, to some degree, repetitious and cumulative, and are gruesome in character, they serve to elucidate and explain relevant oral testimony given at the trial and they were properly admitted for the purpose of showing fully the scene of the crime, the nature of the wounds of the victim, and the condition of the basement immediately after the crime was committed."
Only Exhibit No. 2 in the instant case revealed the nature of the victim's wound. Exhibits Nos. 3 and 7 show the scene of the crime and the condition of the hallway immediately after the crime had been committed. The fact that Exhibits Nos. 3 and 7 pictured the body of the deceased after it had been moved from the exact position in which it was found does not detract from their relevance and probative value; for the presence of the body in approximately the same position would provide jurors with a device by which to orient themselves with respect to the physical character and dimensions of the hallway and nearby rooms in which the struggle took place.
The next issue presented is whether the trial court erred in refusing defendant-appellant's tendered Instruction No. 3, which states that the defendant is not required to prove that he acted in self-defense; but rather, the burden is on the State to prove beyond a reasonable doubt that the defendant did not.
Our Supreme Court has stated the principle that a trial court's refusal to grant a tendered instruction will not be reversed unless, considering the evidence *97 in the case, the substance of the instruction was required to be given and was not covered by other instructions which were actually given. Fuller v. State (1973), Ind., 304 N.E.2d 305; Hash v. State (1972), Ind., 284 N.E.2d 770; DeBoor v. State (1962), 243 Ind. 87, 182 N.E.2d 250; Kennedy v. State (1935), 209 Ind. 287, 196 N.E. 316.
In the instant case, the substance of tendered Instruction No. 3 was covered by Instructions Nos. 13, 16 and 17 which were given by the trial court.
The next issue is whether the trial court erred in permitting the introduction of State's Exhibit No. 12, a prior written statement made by State's witness Jonnie Mae Robinson. Appellant contends that the statement which was introduced during redirect examination of the witness by the State constituted inadmissible hearsay.
The record reveals that during cross-examination of Miss Robinson the defense made inquiries concerning the contents of the witness' prior statement to the police in an effort to impeach her testimony under direct examination. In doing so, the defense, in effect, opened the door to the introduction of the entire statement during redirect examination by the State. Where a portion of a statement or conversation is placed into evidence, the adverse party is entitled to prove the remainder. Brown v. State (1915), 184 Ind. 254, 108 N.E. 861; Elgin, Joliet & Eastern R. Co. v. Collins (1970), 147 Ind. App. 343, 260 N.E.2d 810; Shelby Nat'l. Bk., Adm. v. Miller (1970), 147 Ind. App. 203, 259 N.E.2d 450.
The final issue presented is whether the trial court erred in permitting the State to treat its own witness as hostile and thereafter impeach the witness' credibility by utilizing excerpts from a prior extrajudicial statement.
During the course of the trial, the defendant's wife, Patricia Patterson, was called to testify by the State. Under direct examination, the witness stated that she did not know whether her husband had a knife at the time she and her husband first departed for George Hall's apartment; but that she did notice that her husband had a knife when they arrived at their destination. Mrs. Patterson also testified, in part, with regard to the argument and struggle which subsequently took place, as follows:
"Q What happened  what did you see happen next, if anything?
"A James asked George a question and I told him to shut up and let me tell him what happened, and then James swung at me and George went at James.
* * * * * *
"Q What did George say, if anything, as he went at James?
"A I didn't hear him say anything.
"Q What did he do, if anything?
"A He grabbed James hand, the hand he had the knife in, and he got James in the bedroom and had him up against the wall.
"Q Had James up against the wall?
"A Yes.
"Q Had you heard James say anything up to this point in time, with reference to killing anyone?
"A No.
"Q Did you ever hear James say anything that evening with reference to killing anyone?
"A No.
"Q Now what happened next, after James, after George had James up against the wall?
"A He had, I think he had James hand, the hand he had the knife in and he had his other hand up on James throat. And he was pushing *98 James and bucking him up against the wall.
* * * * * *
"Q George was knocking James around pretty bad?
"A Yes."
Subsequently, during redirect examination, the State expressed to the court its surprise by the testimony of Mrs. Patterson and asked permission to treat her as a hostile witness for the purpose of impeaching her testimony. After examining a copy of a statement made previously by Mrs. Patterson to the police, the court granted the State's motion over the defendant's objection. Thereafter, the State utilized excerpts from Mrs. Patterson's statement in an effort to impeach her credibility with regard to certain points of her testimony.
Unlike the witness' previous testimony in court, the excerpts indicated that Mrs. Patterson was aware that her husband had a knife before they proceeded to George Hall's apartment and that, in fact, her husband placed the knife at her back while instructing her that they would proceed to the decedent's apartment. Contrary to Mrs. Patterson's testimony under oath, her previous version further disclosed, in general, that George Hall was not the aggressor in the struggle and had tried to back into his bedroom during the argument.
Mrs. Patterson's statements during direct examination were prejudicial to the State which had the burden of proving intent on the part of the defendant and that the defendant did not act in self-defense. The State further made a proper showing of surprise. Accordingly, we find no abuse of discretion on the part of the trial court in permitting the State to treat Mrs. Patterson as a hostile witness.
Inasmuch as appellant specifically questions the propriety of the action of the trial court in permitting the State to read to the witness excerpts of her prior statement, we note that where the testimony of a witness for the State is prejudicial to the prosecution, the State may, upon a proper showing of surprise, indicate that the witness made statements which were to the contrary. White v. State (1967), 249 Ind. 105, 229 N.E.2d 652; Blum v. State (1925), 196 Ind. 675, 148 N.E. 193.
In the present case, the portions of the statement were employed as a device by which to attack the witness' credibility as to the points upon which her testimony was prejudicial and not as evidence of the guilt of the appellant. White v. State, supra. As such, the excerpts from the statement must be considered to be competent. See: Rhodes v. The State (1890), 128 Ind. 189, 27 N.E. 866.
No reversible error having been demonstrated, the judgment of conviction appealed from is affirmed.
Affirmed.
GARRARD and LOWDERMILK, JJ., concur.